# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE

|                                      |   |                              |
|--------------------------------------|---|------------------------------|
| *IN RE:*                             | ) |                              |
|                                      | ) |                              |
| GREGORY RILEY MITCHELL               | ) |                              |
| SUZANNE SAVAGE MITCHELL              | ) | *Case Number: 07-02913*      |
| *Debtors*                            | ) | *Chapter 13*                 |
|                                      | ) | *Hon. Marian F. Harrison*    |

## *MEMORANDUM*

This matter is before the court on confirmation of Gregory Riley Mitchell and Suzanne Savage Mitchell's (hereinafter "debtors") proposed chapter 13 plan. Family Advantage Federal Credit Union (hereinafter "FAFCU") filed an objection to the debtors' proposed cramdown of their "910 car" claim pursuant to 11 U.S.C. § 1325(a)'s hanging paragraph[1] and 11 U.S.C. § 506, and also based upon the plan's proposed interest rate. Henry E. Hildebrand III, the Standing Chapter 13 Trustee, filed a brief in support of the debtors' plan and the matter was set for hearing on August 31, 2007. At that time, FAFCU requested until September 10, 2007 to file an additional brief in support of its position. The court took the matter under advisement, and allowed time for the additional brief. For the reasons contained herein, the court OVERRULES FAFCU's objection to confirmation, and orders that an additional hearing be held November 30, 2007, at 9:00 a.m. at the Old Post Office Building in Columbia, TN on FAFCU's

---

[1] Also commonly referred to in judicial writings as "11 U.S.C. § 1325(a)(*)." ***See In re Sanders***, __ B.R. __, 2007 WL 2047233, p. *2 n.3 (Bankr. W.D. Tex., Oct. 18, 2007).

remaining objections to confirmation.

Resolution of this matter is a core proceeding. 28 U.S.C. § 157(b)(2). The court has reviewed the testimony from the hearing and the record as a whole. This Memorandum Opinion serves as the Court's findings of facts and conclusions of law. FED. R. BANKR.P. 7052.

The debtors filed a Chapter 13 bankruptcy petition on April 27, 2007. FAFCU filed a claim in the amount of $30,094.99 secured by a 2006 Chevrolet Trailblazer ("the Vehicle"). The Debtors' proposed Chapter 13 plan seeks to treat the claim as secured under the provisions of § 506 to the extent of the value of the vehicle, which the Debtors contend is $19,125.00. FAFCU objects to the bifurcation of the claim, citing 11 U.S.C. § 1325(a)(*) ("the hanging paragraph").

The Retail Buyers Order provides as follows:

| VEHICLE PRICE | 29,663.78 |
|---|---|
| Including Dealer Installed Options | 29,663.78 |
| DISCOUNT | N/A |
| Selling Price | 29,663.78 |
| Trade In: 1998 Lincoln Navigator | |
| (Mileage and Serial Number Excluded Here) | 5,532.95 |
| BALANCE AFTER TRADE-IN CREDIT | 24,130.83 |
| Tennessee Sales Tax | 1,694.23 |
| Williamson County Sales Tax | 80.00 |
| Bus. Tax Act Chapter 387 .003% | 72.39 |
| Registration–New or Transfer | 14.00 |
| Customer Service | N/A |
| TOTAL | 25,991.45 |

| Extended Service Contract | N/A |
|---|---|
| Trade In Payoff | 13,113.30 |
| TOTAL ALL CHARGES | 39,105.15 |
| Less: Factory Rebate Assigned to Dealer | N/A |
| Less: GM Employee Incentive Assigned to Dealer | 8,180.00 |
| Less: Down Payment | 250.00 |
| CASH DUE ON DELIVERY | 30,675.15 |
| Balance to Be Financed | N/A |

The Debtors' trade-in of a 1998 Lincoln Navigator reflects a trade-in credit of $5,532.95 given by the Dealer and a trade-in payoff of $13,113.70 on the Navigator, resulting in "negative equity," in the amount of $7,580.75 ($13,113.70 - $5,532.95 = $7,580.75).

The loan instrument, a Loanliner Agreement dated November 22, 2006, indicates a loan in the amount of $30,823.61. The loan instrument, on its face, does not indicate what portion of the loan was initially secured by the purchase of the Vehicle or how to apportion the payments. The terms of the loan document include cross collateralization language that indicate collateral securing other loans would be used to secure this loan and vice versa. No additional amounts were loaned on this agreement prior to the bankruptcy filing date. The parties have stipulated that the Vehicle was acquired for the personal use of the Debtor.

The Debtors' proposed Chapter 13 plan seeks to treat the claim as secured under the provisions of § 506 to the extent of the value of the vehicle, which the Debtor contend is $19,125.00. Specifically, the debtors argue that the negative equity financing of their trade-in destroyed FAFCU's PMSI for the "entire claim" thereby removing this transaction from the hanging paragraph protections as a 910 vehicle.

3-U.S. Bankruptcy Court, M.D. Tenn.

Case 1:07-bk-02913    Doc 47    Filed 11/15/07    Entered 11/15/07 09:59:23    Desc Main
Document    Page 3 of 16

FAFCU argues that all of the amounts financed by FAFCU were directly connected to the debtors' purchase of the new vehicle. These amounts included (1) the cash price of the new vehicle, (2) the amount needed to pay off the lien on the old vehicle, and (3) other items directly related to the purchase of the motor vehicle. FAFCU has a purchase money security interest in the debtor's new vehicle that covers the entire obligation incurred at the time of the purchase of the vehicle that secures the transaction. While FAFCU contends that there is no negative equity[2] financed in this transaction, if the court did find negative equity was included, it would still be a secured part of the transaction. More specifically, under Tennessee law and the Bankruptcy Code, negative equity is a part of FAFCU's PMSI because negative equity must be disclosed as part of the "total sale price" of the new vehicle, and is included in the UCC definition PMSI.[3] FACU's advances as further support the Truth-In-Lending Act and Regulation Z (12 C.F.R. P)t. 26) requiring fees, costs, and charges be included in the disclosure of the amount financed. According to FAFCU, under TILA, auto financing is considered purchase money even though part of the proceeds are used to satisfy the remaining debt owed on a trade-in vehicle, thereby necessarily included in the "price" of the vehicle.[4]

---

[2] FAFCU lacked proof to show that the trade-in was anything other than negative equity.

[3] FAFCU relies upon the UCC definition of PMSI and Official Comment 3 to § 9-103. Comment 3 explains how "total sales price" and "value given to enable" are part of the PMSI. Comment 3 states that these prongs include "obligations for expenses incurred in connection with acquiring rights in the collateral." According to FAFCU, the trade-in and payoff of the negative equity were both part of the price and enabled the debtors to acquire rights in the Vehicle.

[4] On two consolidated chapter 13 cases, **In re Hayes**,, ___ B.R. ___, 2007 WL 3244010 (Bankr. M.D. Tenn., Nov. 1, 2007) and **In re Tucker**, Case No. 07-03798 (Nov. 1, 2007), Judge Lundin addressed the applicability of the TILA in this context. . He concluded, and this court agrees that:

> GMAC looks to the requirement in the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601-1667f and as implemented by Regulation Z (12 CFR Pt. 226), that funds advanced for insurance in a retail installment contract are included in the disclosure of total sales price. See 12 C.F.R. Pt. 226, Supp. I, at ¶ 18. **In re Pajot**, 371 B.R. 139, 150 (Bankr. E.D. Va. 2007), rejected this argument. As the

The Chapter 13 Trustee agrees with the debtors that FAFCU does not have a PMSI for the entire contract amount under Tennessee law, and therefore the PMSI protections are completely destroyed.[5] The Tennessee Uniform Commercial Code provides that a security interest is a purchase money security interest to the extent the goods secure a "purchase money obligation" incurred with respect to that collateral. ***Tenn. Code Ann.§ 47-9-103***. In this definition, "purchase money obligation" means: "an obligation ... incurred as all or part of the price of the collateral or for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used." ***Tenn. Code Ann. § 47-9-103(a)(2).*** Under Tennessee state law FAFCU does not have a purchase money security interest in the negative equity because the portion of the contract amount that went to negative equity was not a part of the price of the collateral, nor is the negative equity "value given to enable the debtor to acquire rights in our use of the collateral."

The parties have presented to the court, although on different facts, much of the same issues there were put before Judge Boswell in the case of ***In re Bray***, 365 B.R. 850 (Bankr. W.D. Tenn. 2007) in the Bankruptcy Court for the Western District of Tennessee. Judge Boswell's opinion in ***Bray*** provides an excellent summary of the law

---

>    ***Pajot*** court explained, TILA offers a "convenient and clear disclosure mechanism by which consumers are able to see and trace the negative equity [and other add-ons] rolled into their financing transaction. . . . TILA does not serve to define the relative priorities of creditors, and should not alter the substantive rights of the parties transacting under state secured transactions law." ***Pajot***, 371 B.R. at 151.

***Hayes*** at *12.

[5] The Trustee argues that if the court attempts to apportion the claim between purchase money security interest and non-purchase money security interest under the dual status rule, the burden must be on the creditor as how payments have been applied in order for the court to determine the amount of the purchase money security interest.

with respect to Tennessee PMSI law.[6]  Tennessee's definition of "purchase money

---

[6]Tennessee's current statutory definition of a "purchase money security interest" appears in T.C.A. § 47-9-103 and provides in relevant part:

(a) DEFINITIONS. In this section:

    (1) "purchase-money collateral" means goods or software that secures a purchase-money obligation incurred with respect to that collateral; and

    (2) "purchase-money obligation" means an obligation of an obligor incurred as all or part of the price of the collateral or for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used.

(b) PURCHASE-MONEY SECURITY INTEREST IN GOODS. A security interest in goods is a purchase-money security interest:

    (1) to the extent that the goods are purchase-money collateral with respect to that security interest;

    (2) if the security interest is in inventory that is or was purchase-money collateral, also to the extent that the security interest secures a purchase-money obligation incurred with respect to other inventory in which the secured party holds or held a purchase-money security interest; and

    (3) also to the extent that the security interest secures a purchase-money obligation incurred with respect to software in which the secured party holds or held a purchase-money security interest.

...

(e)    (2) In a consumer-goods transaction, if the extent to which a security interest is a purchase-money security interest depends on the application of a payment to a particular obligation:

    (A) the payment must be applied so that the secured party retains no purchase money security interest in any property as to which the secured party has recovered payments aggregating the amount of the sale price including any finance charges attributable thereto; and

    (B) for the purposes of this subsection only, in the case of items purchased on different dates, the first item purchased shall be deemed the first paid for, and in the case of items purchased on the same date, the lowest priced item shall be deemed first paid for.

(f) NO LOSS OF STATUS OF PURCHASE-MONEY SECURITY INTEREST IN NON-CONSUMER-GOODS TRANSACTION. In a transaction other than a consumer-goods transaction, a purchase-money security interest does not lose its status as such, even if:

    (1) the purchase-money collateral also secures an obligation that is not a purchase-money obligation;

security interest" requires (1) an obligation to be "incurred as all or part of the price of the collateral" or (2) for the loan proceeds to "enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used." **T.C.A. § 47-9-103(a).** The first question for this court, then, is whether the obligation incurred was part of the "price" of the vehicle.

FAFCU urges the court to find that the "price" of the vehicle includes the payment of negative equity. This court disagrees and instead finds that there are "two separate financial transactions memorialized on a single retail installment contract document for the convenience of some consumers and to allow the auto industry to sell more vehicles, which is good for both parties." ***In re Price***, 363 B.R. 734, 741-42 (Bankr. E.D.N.C. 2007). However, "the debt incurred in the separate optional transaction where negative equity is refinanced as part of the combined transaction does not result in a purchase-money security interest." ***Id.; see also In re Hernadez-Simpson***, 369 B.R. 36 (D. Kan. 2007 ) (finding two separate transactions memorialized in a single retail installment contract citing ***Price***); ***In re Vega***, 344 B.R. 616 (Bank. D. Kan. 2006) (same). Judge Leif Clark's recent opinion in ***In re Sanders***, __ B.R. __, 2007 WL 3047233 (Bankr. W.D. Tex., Oct. 18, 2007) provides an excellent analysis of why the financing of negative equity is not included in the "price of the collateral." Judge Clark

---

(2) collateral that is not purchase-money collateral also secures the purchase-money obligation; or

(3) the purchase-money obligation has been renewed, refinanced, consolidated, or restructured.

...

(h) NON-CONSUMER GOODS TRANSACTIONS; NO INFERENCE. The limitation of the rules in subsections (e)(1), (f) and (g) to transactions other than consumer-goods transactions is intended to leave to the court the determination of the proper rules in consumer-goods transactions. The court may not infer from that limitation the nature of the proper rule in consumer-goods transactions and may continue to apply established approaches.

7-U.S. Bankruptcy Court, M.D. Tenn.

concludes that under a straightforward reading of the Texas U.C.C.[7] "in the context of a retail sale and financing of a motor vehicle to a consumer, 'price of the collateral' does *not* include the amount financed to pay off the negative equity from the vehicle traded in." ***Id***. at *12. [8]

Having determined that the negative equity was not part of the "price," the court must now determine if the negative equity enabled the debtor to acquire rights in or the use of the collateral. The court finds that negative equity does not so enable the debtors. ***See, e.g.***, ***In re Acaya***, 2007 WL 1492475, *5 (Bankr. N.D. Cal. May 18, 2007); ***In re Peaslee,*** 358 B.R. 545, 557 (Bankr. W.D.N.Y. 2006), ***rev'd, General Motors Acceptance Corp. v. Peaslee***, 2007 WL 2318071 (W.D.N.Y. Aug. 15, 2007); ***In re Price***, 363 B.R. 734, 741 (Bankr. E.D.N.C. 2007); ***In re Westfall***, 365 B.R. 755, 762 (Bankr. N.D. Ohio 2007); ***In re Hernadez-Simpson***, 369 B.R. 36, 48 (D. Kan. 2007) ("Providing a loan to refinance negative equity on a trade-in, which may be a convenient but unnecessary option for a consumer purchasing a replacement vehicle, is not value given to "enable" that consumer to acquire rights in or the use of the replacement collateral. The term "enable" refers to what it has always referred to, which

---

[7] Tennessee and Texas U.C.C. statutory laws are substantially similar. Both statutes contain (albeit in differing forms) non-consumer transaction provisions for allocation of payments for mixed PMSI security interests.

[8] As explained in the Comments to Tennessee's Uniform Commercial Code, the types of related obligations that should be considered a portion of the purchase money obligation are "obligations for expenses incurred in connection with acquiring rights in the collateral, sales taxes, duties, finance charges, interest, freight charges, costs of storage in transit, demurrage, administrative charges, expenses of collection and enforcement, attorney's fees, and other similar obligations." ***Tenn. Code Ann. Uniform Commercial Code Comment 3***. Clearly, the expenses the drafters had in mind were essentially transaction costs; not every expense that makes a transaction possible should be considered an enabling expense. ***See In re Westfall***, 365 B.R., at 762 (asking, sarcastically, whether payment of a doctor's fee would cover an enabling expense if a debtor would not have made it to the dealer's lot without an emergency appendectomy).

is the value given to allow the debtor to pay, in whole or in part, the actual price of a new item of collateral being acquired, in these cases the replacement vehicles themselves.") (quoting *In re Peaslee,* 358 B.R. 545, 557 (Bankr. W.D.N.Y. 2006), *rev'd, General Motors Acceptance Corp. v. Peaslee*, 2007 WL 2318071 (W.D.N.Y. Aug. 15, 2007)); *In re Pajot*, 2007 WL 2109892, *10 (Bankr. E.D. Va., July 17, 2007) ("The court sees no distinction between the substance of this transaction and paying off and rolling in any other unsecured debt that may be held by the debtor. The lender could just as easily pay off the debtor's student loans and roll that amount into a secured claim on the second vehicle. The only possible nexus is that the purpose of the first debt was to acquire a vehicle, and the second debt is also to acquire a vehicle."). *In re Bray,* 365 B.R. 850 (Bankr. W.D. Tenn. 2007)[9] ("When negative equity is financed in with a new transaction, courts typically find that the negative equity

---

[9] In *Bray*, the court noted in a footnote that it did not need to decide the negative equity issue in the case. However, other cases have cited *Bray* favorably. Judge Lundin's *Hayes* decision lists cases agreeing that a loan to pay off "negative equity" is not included in a PMSI in a new car for purposes of the hanging paragraph:

> *See In re Westfall*, No. 06-60297, 2007 WL 2777709 (Bankr. N.D. Ohio Sept. 24, 2007) (Negative equity financed as part of car purchase is not a purchase money obligation.); *In re Cohrs*, 373 B.R. 107 (Bankr. E.D. Cal. 2007) (Payoff of prior car is part of a purchase money transaction when debtor actually traded-in existing vehicle; different outcome likely when facts show that debtor did not trade-in existing vehicle.); *In re Pajot*, 371 B.R. 139 (Bankr. E.D. Va. 2007) (Portion of transaction corresponding to negative equity is not considered a purchase money security interest under Virginia law.); *In re Acaya*, 369 B.R. 564 (Bankr. N.D. Cal. 2007) (Amount used to pay negative equity does not constitute part of the price of the collateral or value given to acquire rights in the collateral.); *Citifinancial Auto v. Hernandez-Simpson (In re Hernandez-Simpson)*, 369 B.R. 36 (D. Kan. 2007) (Negative equity financed as part of car purchase is not included in resulting PMSI.); *In re Price*, 363 B.R. 734 (Bankr. E.D.N.C. 2007) (Applying North Carolina law, funds advanced to pay off negative equity on trade-in are not part of purchase money security interest.); *In re Grant*, 359 B.R. 438 (Bankr. W.D.N.Y. 2007) (Trustee carried burden of proof that money to refinance negative equity was not part of purchase money security interest.); *In re Jackson*, 358 B.R. 560 (Bankr. W.D.N.Y. 2007) (Refinancing of negative equity not included in purchase money security interest.); *In re Vega*, 344 B.R. 616 (Bankr. D. Kan. 2006) (Loan proceeds used to pay off prior loan are not purchase money.).

*Hayes* at *11, n24.

is not included within a party's purchase money security interest for purposes of 11 U.S.C. § 1325(a)'s hanging paragraph . . . The Court finds this to be a sound decision. . ."). Again, Judge Clark's opinion in *In re Sanders*, __ B.R. __, 2007 WL 3047233 (Bankr. W.D. Tex., Oct. 18, 2007) provides a persuasive analysis of why the financing of negative equity is not "value given to enable" the debtor to purchase the car. Judge Clark points out any extension of a creditor's argument that without paying off the trade-in, the debtor could not acquire the new car, could lead to PMSI's for paying off a debtor's credit cards to "enable" qualification for a new car loan. *Id.* at *13.[10] Likewise, this court finds these cases to be based on sound reasoning, and finds that the negative equity financing does not "enable" the debtors to acquire rights in or use of the collateral as was intended in the Tennessee statute.[11]

---

[10] Judge Clark writes:

According to FMC, only if the retail seller was willing not only to take the debtor's old vehicle in trade but also to pay off the negative equity on that vehicle would the debtor have been able to buy the new vehicle. Thus, says FMC, paying off the negative equity enabled the debtor to acquire rights in the vehicle being purchased.

The argument, of course, is not without force. However, it once again proves too much. By this logic, were the dealer prepared to pay off some of the debtor's credit card debt to help the debtor qualify for the car loan, that too, following FMC's logic, would be "value given to enable the debtor to acquire rights in the vehicle," as the debtor could be said not to be able to obtain the financing necessary to buy the vehicle unless other debt was first paid down. One needs only a few imaginative moments to think of other examples so far afield that even FMC would have to eventually admit that the formulation would effectively drain "purchase money" of any valid meaning.

*Sanders* at *13.

[11] Alternatively, as noted by Judge Lundin's in depth discussion of the effect of negative equity financing and GAP insurance purchases under section 1325(a)'s hanging paragraph and section 506 in *In re Hayes*, the burden of proof is upon FAFCU to demonstrate that the negative equity financing "enabled" the debtors to purchase this vehicle. That proof was not forthcoming, and even if the court is incorrect in finding that the negative equity financing is not part of the price or not an enablement, the fact that FAFCU did not carry the burden of proof on these particular facts is enough to conclude that the negative equity was not part of the PMSI transaction.

10-U.S. Bankruptcy Court, M.D. Tenn.

Absent the financing of the negative equity, FAFCU would have a PMSI in the vehicle. So, then, what is the effect of a partially perfected PMSI transaction when it is consolidated with a non-PMSI transaction? Judge Lundin examined this very issue in *Hayes*. In an extremely thorough analysis of the application of federal and state law, and particularly 11 U.S.C. § 1325(a)'s hanging paragraph, Judge Lundin concludes that Tennessee is a dual status state, and that "the hanging paragraph's collateral-specific conditions require dissection of allowed secured claims in Chapter 13 cases that does not suggest an all-or-nothing rule." *Id*. Judge Lundin indicates that allowing the hanging paragraph's interplay with state law to create a transformation of the PMSI creates a "wobbly three-legged stool anchored by no obvious congressional policy in this context." *Id.*

While this court finds Judge Lundin's opinion to be superbly written and very persuasive, the court finds more persuasive Judge Leif Clark's opinion in *In re Sanders*, __ B.R. __, 2007 WL 3047233 (Bankr. W.D. Tex., Oct. 18, 2007) wherein Judge Clark determines that the PMSI is destroyed under the hanging paragraph where there is an advance to pay negative equity in the otherwise PMSI purchase of a vehicle. More specifically, *Sanders* explains that courts that have looked to state law to answer the question of protection under the hanging paragraph but those courts are begining their inquiry in the wrong place:

> It is at this point that many courts begin to discuss whether a transformation rule or a dual status rule should apply to the creditor's purchase money security interest. *See, e.g., In re Westfall*, 2007 WL 2777709 at *8 (supplementing its previous order, holding that the transformation rule is "too severe," and allowing the debtor to treat only the non-purchase money portion of the creditor's claim attributable to the payment of negative equity as an unsecured claim); *Citifinancial Auto v. Hernandez-Simposon (In re Hernandez-Simpson)*, 369 B.R. 36 (D. Kan.2007) (holding that the dual status rule applies because the Kansas enactment of the UCC specifically excluded subsection (h) from 9-103 and the applicable paragraphs from the Official Comment, resulting in the all out rejection of the transformation rule for all transactions). But with all due respect to these courts, this analysis begins in the wrong place.

11-U.S. Bankruptcy Court, M.D. Tenn.

> The application of the dual status and transformation rules are appropriate in the non-bankruptcy context when deciding (under state law) whether and to what extent a creditor retains a purchase money security interest when part of the consumer debt is a non-purchase money obligation.
>
> Our task is different. Our task is to determine whether FMC qualifies for the special protection afforded certain creditors under the 910-day provision of the Bankruptcy Code, a question of federal law. For that task, state law rules regarding the application of either the transformation rule or dual status rule are simply irrelevant. Indeed, it will be recalled that section 9.103(h) and the relevant Official Comments of the Texas Business and Commercial Code confirm this notion. ***See Tex. Bus. & Comm.Code*** § 9.103(h) and id., Comment 8. We looked to state law to understand the common meaning of a particular term which was otherwise undefined by the Bankruptcy Code. We did so because accepted rules of statutory construction employed by federal courts counsel us to do so. Once that task has been completed (as it has been here), we must then return to our original task, that of divining the correct interpretation of the statutory language enacted by Congress in the hanging paragraph appended to section 1325(a).
>
> Armed with what we believe to be an accurate understanding of the meaning of "purchase money security interest" as used in the hanging paragraph, our next task is to examine the language of the federal enactment itself. If that language is sufficiently clear and unambiguous, then under a "plain meaning" rule of construction, we should be able to parse Congress' intentions. The precise language of the 910-day provision itself is where we thus must begin.

***Sanders***, at *16-17. Thus, the court in ***Sanders*** begins, and appropriately so, analyzing what protections section 1325(a)(*) provides in light of the state law-defined PMSI. The court agrees that state law is no longer the benchmark at this point in the analysis.

So, then, what protections is FAFCU entitled to under the hanging paragraph given that state law dictates that the financing of the negative equity was not part of the price and did not enable the purchase of the 2006 Chevy Trailblazer? Judge Clark's opinion in ***Sanders*** again provides what this court considers to be the correct answer:

> The [hanging] paragraph self-describes its provisions as an exception to the general rule for secured claims set out in section 1325(a)(5), which allows bifurcation of such claims by means of section 506(a) (which state that a claim in bankruptcy is secured only to the extent of the value of the collateral). ***See Scarborough v. Chase Manhattan Mortgage***, 461 F.3d 406, 410 (3d Cir.2006) (discussing how the antimodification

12-U.S. Bankruptcy Court, M.D. Tenn.

provision of section 1322(b)(2), like the 910-day provision of section 1325(a)(*), carves out a narrow exception to an otherwise general rule). Exceptions to general rules are construed narrowly. ***Scarborough,*** 451 F.3d, at 411; see also In re LaFata, 483 F.3d 13, 20-21 (1st Cir.2007).

So to what narrow class of creditor claims does this exception apply? The statute tells us that the vehicle must have been purchased within 910 days of the bankruptcy filing (a fact regarding which there is no dispute in this case), and that the vehicle must have been purchased for the personal use of the debtor (an issue not raised in this case). In addition, the exception only applies *"if* the creditor has a purchase money security interest securing the debt that is the subject of the claim." ***See 11 U.S.C. § 1325(a)(*)*** (emphasis added). We know on the facts of this case that FMC has a purchase money security interest that secures part of the debt. Is that sufficient to qualify FMC for the narrow exception? In the opinion of this court, the short answer is "no."

The first thing to note about the above-quoted language is the use of the word "if" as a conditional. The word ***"if"*** implies that the purchase money collateral either secures the debt underlying FMC's claim or it does not. Congress could have used different language, such as "to the extent of" or "the extent to which" had it intended that the 910-day rule apply to that portion of the debt that is PMSI, as is the case here. But it did not. Congress certainly knows how to employ "to the extent" language when a sliding-scale result is intended. . . But Congress did not use "to the extent" language in the hanging paragraph to section 1325(a). Congress instead chose to include a simple conditional-"if." The inclusion of "if" must be construed as the intentional exclusion of "to the extent." ***See*** 2a ***SINGER*** § 47:23 at 412-13.

The second thing to note is that the "if" conditional is applied to "the debt that is the subject of the claim." ***See*** 11 U.S.C. § 1325(a)(*). The statute thus requires "the debt" to be secured by a PMSI-not "a part of" the debt or "any portion of" the debt or "that portion of" the debt, all phrases that would deliver very different outcomes. Once again, Congress is deemed to have intended the plain meaning of the language it employed. It certainly could have included phrases like "a part of," "any portion of," "that portion of" or even "to the extent that." But Congress did not include those phrases or any others that could be construed to provide broader protection.

The 910-day provision is clear and unambiguous. It requires the creditor to hold a purchase money security interest securing the debt-not part of the debt, not any part of the debt, not that portion of the debt, but all of the debt that is the subject of the claim. "Debt" is a defined term in the Bankruptcy Code. It means liability on a claim. See id. § 101(12). Claim in turn is also defined in the Code. It means a right to payment. See id. § 101(5). And because the very intention of the hanging paragraph is to exclude the application of section 506(a) (a provision which bifurcates the claim), it should be abundantly clear that "the claim" as used in the hanging paragraph means the whole claim, not just some part of it. As "claim" and "debt" are synonymous in the Code, the Code's use of the phrase " the debt" means the entire debt.

> Congress could certainly have drafted this provision to cover a broader class of creditors had it so intended. Congress has done so in other provisions. *See, e.g.*, id. § 507(a)(7) ("to the extent of ..."), § 507(a)(8) ("to the extent that such claims are for ..."), § 1322(b)(8) ("all or part of a claim ..."), § 1322(f) ("any amounts ..."). It did not do so here, and there is no compelling reason for the court to shrink from the plain import of the statute as written. Congress is presumed to have said what it meant, and to have meant what it said. ***See*** 2a ***SINGER*** § 46:1 at 141-43 (citations omitted).
>
> Thus, if the creditor has a PMSI securing its debt (*i.e.*, the entire debt), and the other prerequisites are present, the creditor will qualify for the narrow exception set out in the hanging paragraph. If the creditor has something less than that (as is the case here), then the creditor does not qualify for the narrow exception, and the general rule set out in section 1325(a)(5) will apply. FMC does not qualify for the narrow exception set out in the 910-day provision, because not all of the debt is secured by a PMSI. Some of the debt, the portion attributable to financing the negative equity on the trade-in, though secured, is not secured by a PMSI. Because there is a portion of FMC's claim that is not secured by its purchase money security interest, the claim is not the type of claim described in section 1325(a)(*) of the Bankruptcy Code as protected from bifurcation and cram down.

***Sanders*** at *17-18 (citations and footnotes omitted). Judge Clark notes further that while this appears to be a federal transformation rule, it is not:

> While this result appears to be the same as though a transformation rule applied to FMC's security interest, there is a subtle distinction here. The all-or-nothing rule we apply today is derived from the plain language of the Bankruptcy Code itself. It does not come from an interpretation of the UCC or an application of the transformation rules developed in state decisional law. The plain language of the Code simply requires all of the creditor's claim be secured by the creditor's purchase money security interest. Aside from our understanding of the common meaning of "purchase money security interest," for which we looked to the UCC, nothing else in the 910-day provision instructs us to consult state law for a construction of the provision. And even if this court were compelled to consult state law, the state law itself instructs us to look back to the Bankruptcy Code before applying a transformation or dual status rule. ***See Tex. Bus. & Comm.Code*** § 9.103(h); ***see also id.***, ***Comment 8***. Perhaps it is because the term "purchase money security interest" is undefined in the Bankruptcy Code that it has become the cynosure in this provision, tempting other courts to turn to state law and remain there for an in-depth discussion of the transformation and dual status rules. However, once the undefined term is given its common meaning, the remaining language of the provision keeps our focus on the task at hand-that is determining the qualifications for protection under the 910-day provision as a matter of federal law.

***Sanders*** at 18. In this case, FAFCU's partially PMSI secured and partially non-PMSI

secured debt fails to qualify, as a matter of law, for the exception under the hanging paragraph, and therefore the debtors may cramdown FAFCU's claim as proposed in their plan.[12]

To further cement this issue, the ***Sanders*** opinion also notes that even if the hanging paragraph was ambiguous and capable of two reasonable interpretations, the court would nonetheless find because the hanging paragraph is all about a special exception to a general rule, statutory construction rules would favor the narrower interpretation of the exception. Under a narrower construction of the anti-cramdown provision, only claims secured entirely by the PMSI are excepted from 11 U.S.C. § 506. ***Id.*** at *21. This court is in accord. FAFCU advanced funds to pay off negative equity on the debtor's trade-in while also advancing funds for the new vehicle. The canons of statutory construction dictate that under this scenario, FAFCU's claim contains non-PMSI debt and therefore does not qualify for the exception to 11 U.S.C. § 1325(a)(*) and is subject to the general provisions for secured creditors in 11 U.S.C. § 1325(a)(5).

In summary, the court OVERRULES FAFCU's objection to confirmation based on failure to comply with 11 U.S.C. § 1325(a)(*). Under Tennessee state law definitions, the financing of negative equity in the form of the debtors' trade-in is not part of the "price" and did not "enable" the debtor to acquire the Chevy Trailblazer. According to state law, therefore, FAFCU holds a partially secured PMSI debt and a partially secured non-PMSI debt. Applying FAFCU's state law-defined status to 11 U.S.C. § 1325(a)(*), the court finds that under the unambiguous statute, FAFCU does not qualify for the narrow exception and may be treated as any secured creditor

---

[12] FAFCU reserved the issue of the debtors' proposed interest rate as an objection to confirmation. Therefore, as noted elsewhere, this case will be reset for confirmation on November 30, 2007 in Columbia.

pursuant to 11 U.S.C. § 1325(a)(5). If however, 11 U.S.C. § 1325(a)(*) is ambigious, the court nonetheless finds that statutory construction rules would favor the narrower interpretation of the exception thereby rendering the hanging paragraphy's narrow exception unavailable to FAFCU.

The court will instruct counsel for the debtor to prepare an Order not inconsistent with this Memorandum within five (5) days of entry of the Memorandum. A rescheduled confirmation hearing on FAFCU's remaining objections to confirmation shall be held on November 30, 2007, at 9:00 a.m. at the Old Post Office Building in Columbia, TN.

It is, THEREFORE, so ordered.
This ____ day of November, 2007.

***THIS MEMORANDUM WAS SIGNED AND
ENTERED ELECTRONICALLY AS INDICATED
AT THE TOP OF THE FIRST PAGE.***